Estate of Dan C. Marcus, Myrtle Martin Marcus, Administratrix v. Commissioner. Myrtle Marcus v. Commissioner.
Estate of Marcus v. Commissioner
Docket Nos. 41960, 41961.
United States Tax Court
T.C. Memo 1955-298; 1955 Tax Ct. Memo LEXIS 43; 14 T.C.M. (CCH) 1150; T.C.M. (RIA) 55298; October 31, 1955
*43 Milton R. De Reyna, Esq., for the petitioners. D. Louis Bergeron, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These consolidated proceedings involve deficiencies in income tax for the calendar year 1946 against Dan C. Marcus and Myrtle Martin Marcus in identical amounts of $27,130.80. Dan C. Marcus died prior to the petition being filed. Myrtle Martin Marcus is administratrix of his estate. The only question is whether respondent properly increased petitioners' distributive share of partnership income for 1946 by increasing the partnership net income. Findings of Fact Dan C. Marcus, hereafter referred to as decedent, and Myrtle Martin Marcus, hereafter referred to as petitioner, filed individual income tax returns for 1946 with the collector of internal revenue for the district of Louisiana. Under Louisiana community property laws, each reported one-half of decedent's distributive share of partnership income, as determined by the partnership bookkeeper. Decedent was an equal partner with Charles Buisson and Ralph Gall in a commission business of placing bets on race horses for customers. The firm, known as Marcus, Buisson, *44 and Gall, had its principal place of business in New Orleans. All three partners were actively engaged in the business. Two of their employees, Rene Labarre and Louis Trust, also handled bets, activity of the latter being confined to the office. Edward Bothe was employed as a bookkeeper. Labarre and Bothe are now dead and Trust incapacitated. The office was equipped with four telephones by which most of the business was conducted. That business consisted of taking and placing orders to make bets with handbooks in or about New Orleans, where approximately 800 to 1,000 bookmakers operated. Business originated both locally and from out-of-town customers including those in Baton Rouge, Louisiana; Houston, Texas; Cincinnati, Ohio; Chicago, Illinois; Harrisburg, Pennsylvania; Las Vegas, Nevada; and California. Some business originated in the office where local businessmen were allowed to take bets that came in on telephone orders. Occasionally, bets for these customers were made at the race track by a partner or an employee. A partner attempted to lay off the bets placed by the callers and the customers in the office. This was done by telephone calls to various bookmakers, first to *45 those who would pay the partnership 2 per cent, then to those who would pay 1 per cent, and finally to those who would pay no commission. If this proved unsuccessful, a partner or Labarre would take cash and try to lay off the bets personally with bookmakers around the city. Sometimes bets from one out-of-town customer were laid off to another. Occasionally bets were laid off at the race track. If none of these efforts were successful, the partnership was forced to back the bet itself, but that was not the usual order of business. When an order was received, either by telephone or in person, it was recorded on a scratch pad. Each bet was entered on a separate ticket showing the name of the bettor, the amount bet, and the horse involved. Below that was written the name of the bookmaker who took the bet and the rate of commission he paid. If cash was sent out to a local bookmaker, that was also indicated. The bettor might be identified on the ticket by an alias or a number rather than by name. Each day, an individual sheet was prepared for each bettor. At the end of the day, a summary of all tickets for any one customer was placed on his sheet. If the partnership owed him money, *46 the commission was deducted; if the money was due it, the commission was added. These sheets were totaled to show the net amount won or lost. A separate sheet would be prepared for "Cash," and on this would be entered cash bets from customers in the office as well as bets laid off in cash with local bookmakers or at the track. The figures from individual sheets were put on a daily recap sheet, prepared in triplicate, one copy going to each partner. The recap showed total receipts from identified bettors and "Cash," total disbursements to identified bookmakers and to "Cash," and disbursements for operating expenses, including rent, telephone, race news service, laundry service, salaries and wages, and social security taxes. The difference between the total collections and the total pay-outs, including expenses, was to represent income for the day. The partnership posted a wall sheet for each day of operations containing race information needed in its business and by its customers. After the daily recap was made, the individual sheets and the "Cash" sheet were rolled up with the wall sheet, secured by a rubber band, and dated. They were then kept in a desk drawer for no more than *47 30 days before being destroyed. The tickets or scratch sheets were kept for 7 to 10 days to check possible errors. Then they would be destroyed, in part due to fear of a police raid. During 1946, the only permanent records maintained by the partnership were a black-bound book called the ledger and a grey-bound book called the daybook or journal. No other records or documents were produced for audit or investigation. All cash and checks were handled by Gall who made deposits of a portion of the checks to his personal checking account. All disbursements by check were made from his personal account for either partnership or personal expenditures. Periodically, decedent delivered to the bookkeeper at his home several of the recaps. At no time was the bookkeeper furnished the scratch sheets, customers' account or "Cash" sheets, or the bank statements showing the deposits and withdrawals. From the recaps the bookkeeper made entries in the ledger and the daybook or journal. All of the information on the daily recaps was contained in the ledger, while the daily wins or losses for the year were carried to the daybook or journal. The bookkeeper never attempted to reconcile Gall's bank account, *48 or the daily sheets with the recaps. The daily wins or losses did not reflect the amount of commission received on each individual transaction. The ledger shows total collections for 1946 of $2,259,030.40 and total pay-outs of $2,220,067.40. Included in these amounts are $585,525.50 and $654,922.50, respectively, which represent the totals of items which are identified in the ledger only by the description "Cash." Pay-outs to "Cash" exceeded collections of "Cash" by $69,397. Each side of the daily entry in the ledger was totaled and the net difference found, which was to represent gain or loss for the day. The net amount was carried to the journal where a monthly total was taken. The monthly total wins, total losses, and net wins as shown in the Journal were as follows: Total
Total
Year 1946
Wins
Losses
Net
January
$ 1,778.55
$ 283.80
$ 1,494.75
February
1,360.65
659.95
700.70
March
2,190.35
581.35
1,609.00
April
1,605.25
705.70
899.55
May
3,195.35
1,205.60
1,989.75
June
4,104.50
592.30
3,512.20
July
3,346.70
224.85
3,121.85
August
3,047.10
256.85
2,790.25
September
1,343.45
611.80
731.65
October
968.45
894.35
74.10
November
1,641.70
605.25
1,036.45
December
2,018.40
385.55
1,632.85
Year 1946
Wins
Losses
Net
Total
$26,600.45
$7,007.35
$19,593.10
*49 A partnership return of income for 1946, prepared on a cash basis by the bookkeeper and signed by Gall, was filed with the collector of internal revenue for the district of Louisiana disclosing gross receipts of $38,963, deductions of $19,369.90, and ordinary net income of $19,593.10. Petitioner and decedent each reported one-half of decedent's distributive share of the net income. In the statutory notices of deficiency, respondent determined that the partnership net ordinary income had been understated by at least $299,891.56 based on the following computation: Partnership income reported
$ 19,593.10
As corrected
319,484.66
Additional income
$299,891.56
Decedent's 1/3 interest therein
$ 9,963.84
Additional income, each spouse
49,981.92 The additional income before deducting operating expenses and income already reported is equal to exactly 15 per cent of the gross collections. The operating expenses and gross collections are as reported in the return and as revealed by the ledger and journal. The partnership's true gross income was 2 per cent of its total collections of $2,259,030.40. Opinion As in other similar cases "the question resolves itself *50 into one of fact and we think it should properly be decided on the basis of the weight to be given to the evidence adduced. Cf. H. T. Rainwater, 23 T.C. 450." Jack Showell, 23 T.C. 495, 499. Respondent contends that his arbitrary figure of 15 per cent has not been shown to be erroneous but with this we are forced to disagree. Particularly in view of the evidence of the manner in which this betting business was conducted, any such figure would not only be arbitrary but grossly excessive. On the other hand, petitioner had no right to complain that respondent did not accept the partnership's figures since the taxpayers themselves were the ones who were responsible for destruction of the original records; nor of the fact that respondent has accepted some of the figures shown by the books of account and rejected others. Jack Showell, supra. Giving effect to the testimony that most of the partnership's income was from commissions not exceeding 2 per cent, we do not know how many bets carried commissions of 2 per cent, how many of 1 per cent, and how many of nothing. But the absence of records from which these figures could be adduced is of the *51 partnership's own making. Assuming a 2 per cent commission on all business, the gross income figure to be employed should be approximately $45,000. While on the one hand this gives no effect to the possibility that some bets were made at a lower commission, it also takes no account on the other hand of the possible net wins on bets which the partnership was required to retain. We have accordingly concluded that in the absence of more definite records, the gross income to be employed is the 2 per cent figure in place of the $38,963 shown on the return. Our finding of fact to this effect disposes of the controversy. Decisions will be entered under Rule 50.